## Cernica v. Pennzoil

436

*William G. McConnell,* for plaintiffs.
*Craig W. Jones* and *Evan C. Rudert,* for defendants.

FORNELLI, *J.,* May 30, 1990 — This is an action brought by two individuals, John N. Cernica and Anthony T. Deramo, trading and doing business as Shenango Valley Sand and Gravel, for damages allegedly resulting from the use of defective diesel fuel in their equipment. Named as defendants are Pennzoil Products Company, the manufacturer/supplier of the allegedly defective fuel, and Wayne Thomas, a Pennzoil manager from whom the fuel was purchased. Also named as a defendant is plaintiffs' insurer, Rockwood Insurance Company. Shenango seeks to recover the monies paid for the defective fuel, the cost of repairing the damaged equipment, $50,000 in lost revenue, plus interest, legal fees and costs.

Presently before the court is Rockwood's motion for partial summary judgment, which for the reasons set forth below is granted.

Summary judgment is appropriate only when the record clearly "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b). "All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 204, 412 A.2d 466, 469 (1979). See also, *Pocono International Raceway Inc. v. Pocono Produce Inc.,* 503 Pa. 80, 82-3, 468

A.2d 468, 470 (1983). Further, "the court is required to give the non-moving party the benefit of *all* reasonable inferences which may be drawn from the facts." *Helinek v. Helinek,* 337 Pa. Super. 497, 502, 487 A.2d 369, 372 (1985). (emphasis in original) Accordingly, the relevant facts in the matter now before the court must be reviewed and are set forth in the light most favorable to plaintiffs.

Shenango has its offices in Youngstown, Ohio, and a place of business in Jamestown, Mercer County, Pa. In June 1984, Shenango purchased diesel fuel from Wayne Thomas at Pennzoil's facility in Hubbard, Ohio. The fuel was delivered to Shenango in Jamestown, Pennsylvania. Shenango there used the fuel in three diesel engines which stopped operating in April 1985. Subsequent analysis determined that the problem with the three engines was the result of water contamination in the diesel fuel purchased from Thomas and Pennzoil the previous June.

Shenango was insured against certain property damage under an inland marine policy of insurance purchased from Rockwood. The policy covered all risks from external causes which resulted in damage to or direct physical loss of enumerated pieces of equipment. The initial policy covered the period from April 1, 1984, until April 1, 1985, and was twice renewed to provide coverage until April 1, 1987. Pursuant to this policy of insurance, on April 22, 1985, Shenango submitted a claim to Rockwood for the cost of repairs to the three diesel engines damaged by the contaminated fuel. In December 1985, Rockwood paid $1,186.54 in satisfaction of this claim.

In January 1986, one of these three engines, part of an H-90 Hough Front-end Loader, again broke down and again Shenango submitted a claim to Rockwood for the damage to the equipment. On

March 14, 1986, Rockwood requested that Shenango sign a non-waiver agreement and advised Shenango of its intention to investigate the second breakdown of the front-end loader's engine to determine whether it was caused by the contaminated fuel or was the result of normal wear, improper maintenance or one of several other types of loss excepted from coverage under the terms of the policy. Shenango signed the non-waiver agreement and advised Rockwood that it was an operational necessity that the damaged loader be operational and available for Shenango's use by April 1, 1986.

Rockwood had the loader inspected at the Bonanza Equipment Company in Youngstown, Ohio, and the fuel pump was sent to the United Diesel Company in Beaver Falls, Pa. for analysis by J.E. Davidson of Automotive Consultants in Pittsburgh, Pa. The investigation was completed in mid-June of 1986 and on July 16, 1986, Rockwood advised Shenango that Mr. Davidson had concluded that the second breakdown of the loader's engine was not related to the contaminated fuel, but was the result of fair wear and tear and poor maintenance of the equipment. Consequently, Rockwood declined to compensate Shenango for the second breakdown of the front-end loader.

On September 29, 1987, plaintiffs filed their complaint seeking damages of $60,149.36 in each of three counts, plus interest, costs and, in count III only, legal fees. The $60,149.36 includes the following: (1) $1,186.54 for the cost of repairs to equipment after the 1985 breakdown; (2) $8,962.82 for repairs, transportation and analysis of equipment pursuant to the 1986 breakdown; and (3) $50,000 lost revenue caused by the unavailability of the front-end loader for 30 production days after April 1, 1986. Shenango asserts the joint and several liabil-

ity of Pennzoil and Thomas on the basis of breach of warranty in count I and negligence in count II.

In count III of its complaint Shenango asserts the liability of Rockwood on the basis that the damages relative to the second breakdown of the front-end loader are compensable under the terms of the policy of insurance. Shenango also asserts the liability of Rockwood on the basis of its bad-faith failure to expeditiously investigate and settle Shenango's claim for the second breakdown. According to Shenango, its $50,000 in lost revenues is the result of Rockwood's improper delay in evaluating the cause of the 1986 breakdown.

Without admitting liability as to any other damages sought by Shenango, Rockwood seeks partial summary judgment only as to the $50,000 claim for lost revenues. Rockwood asserts and plaintiff concedes that the lost revenues do not constitute a loss covered under the terms of the policy.* Since the question of whether Rockwood's actions in fact constituted bad faith has not been established by the record in its current state and is, moreover, an issue disputed by the parties, summary judgment cannot be granted on the factual issue of bad faith. Thus, the only issue now before the court is whether Shenango can possibly recover consequential damages in the form of lost revenue solely on the basis of the alleged bad-faith failure of Rockwood to properly and promptly investigate and settle Shenango's 1986 claim.

The Pennsylvania Supreme Court has held that the provisions of the Unfair Insurance Practices

---

\* "The plaintiffs concede that the contract of insurance provides coverage for loss or repair to the equipment and had the plaintiffs only alleged a recovery under the policy, then they would not be entitled to recover anything more than the cost of repairs." Plaintiff's brief in opposition to Rockwood Insurance Company's motion for summary judgment, at 2.

Act, 40 P.S. §§1171.1 through 1171.15, as an adequate remedy and deterrent to bad-faith settlement practices of insurance companies. *D'Ambrosio v. Pennsylvania National Mut. Casualty Ins. Co.,* 494 Pa. 501, 505-8, 431 A.2d 966, 969-70 (1981). In *D'Ambrosio* an insured sought to collect under a policy of property insurance for storm damage to his motor boat and outboard motor. Further, on the basis of alleged bad-faith conduct by the insurer in summarily denying the claim for repairs, the insured also sought punitive damages and damages for emotional distress. *Id.* at 503, 431 A.2d at 967. The Pennsylvania Supreme Court expressly refused to follow the lead of California and a minority of other jurisdictions is creating a "new tort" for bad-faith conduct by insurers. *Id.* at 505-8, 431 A.2d at 968-70, citing *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973); *Bibeault v. Hanover Ins. Co.,* 417 A.2d 313, 318 n.4 (R.I. 1980). Justifying its stand, the *D'Ambrosio* court stated:

"Surely it is for the legislature to announce and implement the commonwealth's public policy governing the regulation of insurance carriers. In our view, it is equally for the Legislature to determine whether sanctions beyond those created under the act [UIPA] are required to deter conduct which is less than scrupulous." *Id.* at 508, 431 A.2d at 970.

The general proscription provision of the UIPA states:

"No person shall engage in this state in any trade practice which is defined or determined to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance pursuant to this act." 40 P.S. §1171.4.

Section 1171.5 of the UIPA sets forth an extensive listing of definitions of those acts and practices deemed unfair under the act. The UIPA further

provides an administrative procedure to remedy violations of its provisions. 40 P.S. §§1171.7 through 1171.9. With regard to these provisions for administrative relief, the Supreme Court in *D'Ambrosio* stated:

"There is no evidence to suggest, and we have no reason to believe, that the system of sanctions established under the Unfair Insurance Practices Act must be supplemented by a judicially created cause of action." *D'Ambrosio,* 494 Pa. at 507, 431 A.2d at 970.

Nevertheless, in Pennsylvania judicial recognition has been given to certain exceptions to *D'Ambrosio's* apparent blanket preclusion of direct tort actions against insurers for alleged bad faith conduct.

In *Pekular v. Eich,* 355 Pa. Super. 276, 513 A.2d 427 (1986), the Superior Court determined that *D'Ambrosio* "was concerned only with the supplementing of the UIPA with as yet unrecognized law claims." *Id.* at 290, 513 A.2d at 434. Consequently, the *Pekular* court did "not read *D'Ambrosio* to preclude *existing* common-law remedies such as fraud and deceit." *Id.* at 284, 513 A.2d at 431. (emphasis in original) Moreover, the *Pekular* court stated:

"We believe that the Legislature has determined that an insured, like any other consumer, may seek compensation for damages incurred as a result of unscrupulous conduct under the provisions of the CPL [Consumer Protection Law] and that the limited remedies of the UIPA do not represent the sole and exclusive deterrent to alleged unfair or deceptive acts of insurers and their agents." *Id.* at 290, 513 A.2d at 434.

Thus, the Superior Court held that the UIPA does not pre-empt either existing common-law remedies or other statutory remedies.

In *Dercoli v. Pennsylvania National Mut. Ins. Co.,* 520 Pa. 471, 554 A.2d 906 (1989) (plurality opinion), the Pennsylvania Supreme Court considered whether an insured could bring an action against her insurer on the basis that the insurer breached an assumed duty of good faith and fair dealing when it undertook to advise the insured of entitlement to present claims, that legal counsel was unnecessary and that the insurer could be relied upon to pay the proper benefits. *Id.* at 473, 554 A.2d at 906. The opinion announcing the judgment of the court stated:

"The duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim." *Id.* at 478, 554 A.2d at 909.

On this basis the insured was permitted to maintain her action against the insurer. In *Dercoli,* the judgment of the court was set forth in an opinion by Justice Larsen, joined by Justice Stout; Justice Papadakos wrote a concurring opinion, joined by Justice McDermott; Chief Justice Nix dissented, as did Justice Flaherty, who filed a dissenting opinion, joined by Justice Zappala.

It cannot be assumed that by *Dercoli* the Supreme Court intended to overrule *D'Ambrosio.* First, neither *D'Ambrosio* nor the rule it enunciated are mentioned or discussed in *Dercoli.* Second, *Dercoli* deals with an insurer's bad-faith counseling of its insureds rather than a bad-faith failure to pay or properly process claims. Third, in an opinion subsequent to *Dercoli,* Justice Larsen, joined by Justices Flaherty and Papadakos, characterized *D'Ambrosio* as holding that the UIPA " 'serves adequately

to deter bad faith conduct' of insurance companies, and 'applies equally to an insured's attempt to recover punitive damages as well as damages for emotional distress.' " *Baker v. Pennsylvania National Mut. Casualty Ins. Co.,* 522 Pa. 80, 83-4, 559 A.2d 914, 915 (1989) (Larsen, *J.,* opinion in support of reversal, quoting *D'Ambrosio,* 494 Pa. at 508, 431 A.2d at 970. The court was equally divided; Justice McDermott, joined by Chief Justice Nix and Justice Zappala, in an opinion in support of reversal, stated that a new trial should be granted because of the prejudicial impact of irrelevant evidence).

*Dercoli* factually and legally is akin to the common-law recognized actions for fraudulent misrepresentation and deceit. The insurer in *Dercoli* voluntarily and specifically assumed a duty to advise and provide its insured with all benefits under the policy and advised her there was no need to seek legal counsel for that purpose. Having procured her reliance the insurer, acting out of a conflict of interest, then failed to inform the insured of benefits that were available to her. Thus, even if *Dercoli's* lead opinion had been supported by a majority of the Supreme Court justices, it would not necessarily overrule *D'Ambrosio* by implication or even necessarily create an exception to its holding.

Finally, it should be noted that the General Assembly has recently enacted Subchapter G to Chapter 83 of Title 42 of the Pennsylvania Consolidated Statutes. This new subchapter deals with special damages and provides:

"§8371. *Actions on insurance policies*

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorney fees against the insurer." Act 1990-6 §3. March 1990 Pa. Legis. Serv. 13.

However, this provision is not effective until July 1, 1990. Act 1990-6 §32(8), March 1990 Pa. Legis. Serv. 44 (Purdon). Therefore, this enactment has no apparent application to the matter now under consideration.

Shenango's claim for $50,000 in lost revenues has not been brought against Rockwood either on the basis of an existing common-law cause of action sounding in tort (such as fraud or deceit) or on the basis of an existing statutory remedy. Moreover, Shenango has not alleged the lost revenues were the result of Rockwood's bad-faith advice as to coverage, benefits or eligibility/claims requirements. Rather Shenango alleges that the lost revenues were the result of Rockwood's bad-faith denial and delay in processing the claim for repair costs pursuant to the 1986 breakdown on the front-end loader. Therefore, the exceptions set forth in *Pekular* and *Dercoli* do not apply and this matter is controlled by the general principle established by the Pennsylvania Supreme Court in *D'Ambrosio.*

Accordingly, Shenango is precluded from seeking lost revenues not covered under the terms of its policy of insurance on the basis of Rockwood's alleged bad faith in claim investigation and denial.

Hence, this

## ORDER

And now, May 30, 1990, Rockwood Insurance Company's motion for partial summary judgment is granted.